# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CASE NO.: 5:11-cv-168

| | | |
|---|---|---|
| DEANA LINGLE; LESLIE TREADWAY; and ROBIN PERUN, | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | **MEMORANDUM & ORDER** |
| THE PAIN RELIEF CENTERS, P.A., HANS HANSEN, M.D., and NOVANT MEDICAL GROUP, INC., | ) ) ) ) | |
| **Defendants.** | ) ) ) | |

**THIS MATTER** is before the Court on Defendants' Motions for Summary Judgment, all filed on May 14, 2013, as to each of Plaintiffs' claims. (Doc. 34, 37, 40, 42). Plaintiffs filed a consolidated response on July 12, 2013 (Doc 48), and Defendants filed reply briefs on August 2, 2013. (Doc. 58, 59).

## I.     PROCEDURAL AND FACTUAL BACKGROUND

Plaintiffs Deanna Lingle ("Lingle"), Leslie Treadway ("Treadway"), and Robin Perun ("Perun") (collectively "Plaintiffs") are former employees of the Defendants Hans Hansen ("Hansen"), The Pain and Relief Centers, P.A. ("PRC"), and Novant Medical Group, Inc. ("NMG") (collectively "Defendants"). Plaintiffs have alleged claims under federal and state law based on their employment with the Defendants. Jurisdiction is established pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331. Supplemental jurisdiction is established pursuant to 28 U.S.C. § 1367. Venue is proper pursuant to 42 U.S.C. § 2000e-4(f)(3) and 28 U.S.C. § 1391(b) as the parties reside in and the acts are alleged to have occurred within the Western District of North Carolina.

PRC is a professional association, organized and existing under the laws of the State of North Carolina, that operates as a medical firm employing medical professionals who administer treatment to the public through pain clinics located in Conover, Statesville, and Salisbury, North Carolina. (Doc. 7 at 3.) Hansen is a physician licensed to practice medicine in the State of North Carolina. Hansen is the owner, sole shareholder, and only physician currently providing services to PRC. (Doc 7 at 3-5.) For a period of time from January 1, 2007, to December 31, 2008, (the "Novant period") NMG owned, operated, and employed PRC's employees. (Doc. 9 at 4.) NMG, a wholly owned subsidiary of Novant Health, Inc. organized and existing under the laws of the State of North Carolina, provides medical services to the general public through a variety of medical centers located throughout North Carolina. (*Id.*)

Lingle was hired by PRC in October of 2004 as a medical office assistant. (Lingle Dep., Doc. 51-15 at 6.) Lingle's role in this position was to take care of the necessary tasks to prepare the patient for a visit with Hansen. (*Id.*) Except for a brief period of time in 2005, Lingle served in this role with PRC, to include the Novant period, until 2009. (*Id.* at 8.) In 2009, in response to a conversation with PRC office manager Gail Smith ("Smith") about alleged sexual harassment, Lingle was moved away from Hansen to work with Carolyn Davis, a nurse practitioner at the Statesville office. (*Id.*) However, even after this change was implemented, Lingle worked with Hansen a few more times in 2009. (*Id.*)

Lingle contends that she first experienced inappropriate interaction with Hansen in late 2005 or early 2006. (*Id.* at 42.) In this instance, in the operating room of the PRC Conover office, Hansen rubbed his hand across Lingle's buttocks. (*Id.*) February of 2009 is the last time Lingle remembers Hansen engaging in inappropriate conduct as to her. (*Id.* at 44.) In this instance, Hansen came up behind Lingle, kissed the back of her neck, rubbed his hands down her back to

her buttocks, and made the comment that he would like to have her for Valentine's Day. (*Id.* at 43-44)

Lingle has described[1] the offensive comments and questions she endured while working with Hansen: Hansen asked whom Lingle was dating and whether they were sexually active. (*Id.* at 44.) Hansen asked Lingle about her sexual positions, her favorite sexual positions, and whether she had orgasms. (*Id.*) On a regular basis, when Lingle arrived for work in the morning, Hansen would ask Lingle whether she had engaged in sex the night before and if she was "soiled." (Decl. of Lingle, Doc. 49-1 at 4.) Hansen asked Lingle to make a video of herself having an orgasm while having sex. (*Id.*) Hansen asked if he could photograph Lingle naked. (*Id.* at 5.) On more than one occasion Hansen called Lingle on her cell phone and asked to have "phone sex" with her. (*Id.*) Hansen accused Lingle of having sex with a drug representative. (*Id.*) Hansen said to Lingle, "[i]f you f*** everyone else, why not let me?" (*Id.*) Hansen stated that he would like to have sex with Lingle while his wife was out of town. (*Id.* at 6.) On several occasions from 2008 to 2009 Hansen told Lingle that he would like for her to take trips with him so that they could have sex. (*Id.*) On December 29, 2008, Hansen told Lingle that he had dreamed about Lingle dancing naked for him, that it "was making his dick hard just thinking about it," and he asked Lingle what kind of things she said when she had sex. (*Id.* at 12.) On January 19, 2009, Hansen said to Lingle that he needed "a whore to cuddle with while his wife was out of town." (*Id.* at 15; Doc. 59-11 at 3.) After stating what it would be like to have sex with Lingle, Hansen said to Lingle, "look it made my dick hard." (Doc 49-11 at 5.)

---

[1] As the non-moving party, Plaintiffs' credibility in her recounting of the factual circumstances is assumed for the limited purpose of the motion. *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990).The factual assertions are presented here in totality, as described in the documents, depositions, and declarations provided by the Plaintiffs, because the issue of whether Hansen's alleged conduct was "extreme and outrageous" is disputed by the Defendants.

Hansen's inappropriate physical conduct with Lingle include: rubbing against her from behind (Lingle Dep., Doc. 51-15 at 45); running his hand across her buttocks (*id.*); attempting to pull down her pants (*id.*); attempting to look down Lingle's shirt when she stooped to pick up charts (Decl. of Lingle, Doc. 49-1 at 6); attempting to pull Lingle's shirt up on more than one occasion (*id.* at 7); putting his hand down her shirt and grabbing Lingle's breasts (*id.* at 8); additional attempts to grab and rub Lingle's breasts (*id.*); rubbing Lingle's legs and pelvic area (*id.*); attempts to kiss Lingle on the mouth , and grabbing Lingle by the waist and rubbing his privates against her buttocks. (*Id.*) On December 9, 2008, when Lingle attempted to resist Hansen kissing the back of her neck while she was seated at a desk, Hansen forcefully grabbed her by her arms and pulled her towards him attempting to kiss her (Lingle Dep., Doc 51-15 at 63.)

Lingle's response to Hansen's conduct varied over time. Initially, Lingle made no response directly to Hansen and did not alter her conduct at work in anyway. (*Id.* at 43.) However, it did not take long before Hansen's conduct had persisted to the point that Lingle began asking a fellow employee, Tina Kookier, to remain at work with her until 8:00 and 9:00 at night because she did not feel comfortable being alone with Hansen. (*Id.*) Lingle states that throughout the course of her employment she never responded to the questions about her sex life posed by Hansen, and that she would often call Hansen crazy and walk away or roll her eyes and walk away. [2] (Lingle Decl., Doc. 49-1 at 3-4.) Additionally, Lingle states in her deposition that she told Hansen to stop after each instance of inappropriate physical conduct except for the "first few times" Hansen "did something." (*Id.* at 45.) Lingle describes her early requests for Hansen to

---

[2] The Court notes that Lingle stated that in one instance she did respond to Hansen's question as to whether the Zoloft medication she was taking had affected her sex life. Lingle attributed this question and her response to be derived from a medical viewpoint rather than a form of sexual harassment. (Lingle Depo., Doc. 51-15 at 166.)

stop as made on a "lighter note," and that it was not until 2008, what Lingle describes as the "worst year," that she "became angry and more aggressive about telling [Hansen] to stop." (*Id.* at 46.) Lingle explains that her requests for Hansen to stop became more "forceful" because Hansen had become "more aggressive with grabbing [Lingle] and squeezing [her] arms and things of that nature."[3] (*Id.*)

On multiple occasions, Lingle brought Hansen's inappropriate conduct to the attention of her superiors at PRC and NMG. Lingle had "some discussion" with NMG office manager Melissa Broadway in 2007 regarding her interactions and relationship with Hansen.[4] Subsequent to this discussion, Lingle spoke to NMG office manager Tracy Goins ("Goins") several times over the phone about Hansen's inappropriate conduct and intrusive questions. (Lingle Decl., Doc. 49-1 at 9.) In December of 2008, Lingle reported alleged harassment to Tracy Goins in person. On that day, Hansen had aggressively grabbed and squeezed Lingle's arms in an attempt to kiss her. (Lingle Dep., Doc. 51-15 at 47.) This instance occurred at the Salisbury office, where Goins maintained her office, so Lingle walked over to tell her about the incident. (*Id.*) As Lingle began to explain her concerns, that Hansen was too "touchy-feely" and that a co-worker had seen Hansen going through Lingle's purse, Goins put her hands up and said that she did not want to

---

[3] Lingle explains: "I think he was trying to see how much he could do or what he could get away with. And, you know, the walking by me and rubbing his hand across my butt and things like that, I mean, it got worse, to him actually walking up behind me and grabbing my waist and putting his privates up against my behind." (Lingle Dep., Doc 51-15 at 45.) Lingle states in her deposition that she believes the change in Hansen's conduct resulted from his knowledge of her beginning a serious relationship with another man ("Lee.")

[4] "[Melissa Broadway] was an office manager for [Novant] when they first converted over. She had made the comment to me, she had heard we were having an affair. But she had gotten information I guess from other employees about favoritism and said that she knew, once she saw Dr. Hansen, that that was not the case, that I was not having an affair. And I did at that point attempt to say: You really don't know what I've had to put up with with him. It's not that he is favoring me; it's different than that. And that was about all I had said to her." (Lingle Dep., Doc. 51-15, at 46.)

hear anymore, that she would be done with Hansen in two weeks, and that if he did not stop, "somebody was going to sue his ass." (*Id.*)

On January 16, 2009, Lingle spoke with PRC Office Manager Smith about Hansen's conduct. (Lingle Decl., Doc 49-1 at 14.) Lingle told Smith that she did not like the way she was treated by Hansen, that Hansen put his hands on her, and that she did not want to work anymore Saturdays with Hansen. (*Id.*) Smith told Lingle that she would help her by moving her away from Hansen but that saying something to Hansen would only risk causing problems. (*Id.*) Again, on January 21, 2009, Lingle reported an incident that occurred on January 19, 2009, in which Hansen told Lingle that he "needed a whore to cuddle with while his wife was out of town." (*Id.*) In response, Smith assured Lingle that she was working on getting Lingle moved away from Hansen. (*Id.*) On January 22, 2009, Smith informed Lingle that Hansen had agreed to allow Lingle to work in Statesville with nurse practitioner, Carolyn Davis, but that such a move would result in reduced hours and the loss of Lingle's insurance benefits. (*Id.*) Instead, Lingle remained in her position working with Hansen for the month of February.

The instance in which Hansen touched Lingle inappropriately and stated that he would like to have her for Valentine's Day, happened on February 9, 2009. (*Id.*) Lingle reported this to Smith on February 12, 2009, and when Lingle approached Smith several days later regarding the move to Statesville, Smith told Lingle that she could quit her job if she could not wait for Smith to move her and that Lingle should "put up or shut up." (*Id.* at 16.) On February 24, 2009, Lingle provided Smith with a letter to be placed in Lingle's file that stated she had been subjected to sexual harassment by Hansen, that she was fearful of reprisals for having reported sexual harassment, and that she was receiving mixed messages from Smith and Hansen regarding her work status. (*Id.* at 17.) Lingle was transferred to Statesville at some point in late February to

early March 2009. (*Id.*) This move resulted in a thirty minute commute to work each way and adverse effects on Lingle's pay and benefits (*Id.*) Lingle's working relationship with Smith and PRC as a whole deteriorated[5] thereafter, culminating in Lingle's termination from PRC on October 30, 2009. (*Id.* at 18-19.)

Treadway began working for PRC in the spring of 2006. (Treadway Depo., Doc. 51-16 at 24-25.) Initially, Treadway worked with PRC patients on physical therapy machines in the Fibro Care building and, when work was slow there, she would work next door at the PRC office building assisting with medical records. (*Id.* at 54-55.) By the end of 2006, Treadway began working as a receptionist on Wednesdays at PRC's Lenoir office. (*Id.* at 57-58.) During the Novant period, Treadway worked full-time in medical records and as a coordinator for patient services. (*Id.* at 59-61.) Treadway's employment with PRC ended in October of 2009, when she took a position with Carolina Oncology Specialists, P.A. (*Id.* at 11.)

Hansen's asserted inappropriate conduct towards Treadway began in early 2007 (*Id.* at 147-49) and persisted until February of 2009. (Treadway Decl., Doc. 49-2, at 3.) In her deposition, Treadway describes Hansen's conduct: several times a day, when Treadway stooped to pick up medical charts, Hansen would gesture for Treadway to lift her shirt or show him inside her shirt. (Treadway Depo., Doc. 51-16 at 150-53.) When discussing medical charts with Hansen, Hansen would rub Treadway's breast with his arm. (*Id.* at 154-55.) On numerous occasions Hansen would gesture for Treadway to come into the bathroom with him. (*Id.* at 154-55.) Hansen would say to Treadway, "I want to see," while gesturing for her to show him her

---

[5] The factual record presented by the parties is not clear as to the exact circumstances surrounding Lingle's termination. On the one hand, Smith recounts a number of infractions by Lingle that were recorded in Lingle's file. (Smith Depo., Doc. 51-10 at 178-85.) However, these alleged transgressions were not dislcosed to Lingle and it is not clear if the controlling guidelines for employees had been communicated to Lingle. (*Id.*)

body. (*Id.* at 283.) Hansen invited Treadway on business trips on the condition that she "put out."

(*Id.* at 174-75.) Hansen would inquire as to Treadway's sexual relations with her boyfriend and

Hansen would ask Treadway if she was "soiled." (*Id.*) In the fall of 2008, Treadway witnessed

Hansen going through Lingle's purse which was located in Treadway's office. (*Id.* at 194-98.) In

December of 2008, Hansen grabbed Treadway, placed her on his lap with his arms wrapped

around her body and breasts, and bounced her up and down in an attempt to be "playful." (*Id.* at

99-100.) On that same day, Hansen placed his face in Treadway's chest "as if someone was

going to come up and snuggle up against your breast," and told Treadway that she could be his

nurse only if she "put out." (*Id.* at 101.) On these occasions, in response to Hansen's conduct,

Treadway would tell Hansen to "stop," walk away, roll her eyes, tell Hansen he was "crazy," or

ask that Hansen think about his wife. (*Id.* at 156-57, 384-85.)

In her deposition, Treadway states that the first time she communicated with superiors

regarding Hansen's conduct was on the phone with Goins in June of 2008. (*Id.* at 124-25.) Goins

would call Treadway regularly to check in and to handle other work-related matters. (*Id.* at 127-

29.) Treadway expressed to Goins that Hansen was too "flirty or touchy" and that he had tried to

look down Treadway's shirt. (*Id.* at 126.) Additionally, on the day Treadway witnessed Hansen

going through Lingle's purse, she immediately called Goins to inform her. (*Id.* at 199.) While on

the phone, Treadway could hear Goins relaying the information to Teresa Miller ("Miller") who

was also an employee of NMG. (*Id.* at 199-200.) Goins told Treadway that she could not believe

"you all put up with that," and that "[Goins and Miller] would see what they [could] do." (*Id.* at

200.) Additionally, Treadway states that in January of 2009 she communicated to Smith that she

was not comfortable with how "flirty" Hansen was and that he had "gone overboard." (*Id.* at 87-

99.) No facts have been presented indicating any NMG response to these reports.

Perun worked for PRC, providing transcription services, from February of 2008 to April 29, 2009, when she took a job with Carolina Oncology Specialists. (Perun Depo., Doc. 51-17 at 14-15, 23.)

From the start of her employment, Perun remembers Hansen touching her shoulder and ruffling her hair, which she interpreted as an attempt to welcome her and make her feel comfortable. (*Id.* at 47-48.) Perun recalls that, in response to this conduct, she would tell Hansen in a friendly manner not to mess up her hair. (*Id.* at 51.) Perun relates that the first time she experienced inappropriate interaction with Hansen was when Hansen said, "[o]h, here, sit down," and pulled Perun down onto his lap in the Conover office. (*Id.* at 48.) Perun estimates that Hansen pulled her onto his lap in this manner a total of three times. (*Id.* at 50.) Each time this happened, Perun would jump up or immediately move to a seat next to Hansen instead of remaining on his lap. (*Id.* at 50.) Inappropriate conduct by Hansen towards Perun came to a stop in February of 2009. (Perun Decl., Doc. 49-3 at 9.) Perun attributes this to the fact that she remarried her ex-husband, Roman Perun, at that time. (*Id.*)

Perun alleges the following conduct by Hansen in addition to that already mentioned: Hansen lifted up Perun's sweater in an effort to see her breasts and commented to Perun that she "looked good," and that her body "looked good," on more than one occasion. (Perun Decl., Doc. 49-3 at 4-8.)  On one occasion in 2008, Hansen placed Perun's hand on his butt and stated that he had a "tight butt." (*Id.*) Hansen asked Perun when she was going to "put out." (*Id.*) Hansen told Perun that she "did something to him." (*Id.* at 5.) During office hours, Hansen brought up a picture of Perun in a bathing suit on a website and commented that she had a "hot body." (*Id.*) Hansen rubbed Perun's breasts with the back of his hand on more than one occasion (*id.* at 7); ran his hand down Perun's back (*Id.* at 7), and Hansen stuck his face in Perun's neck area to

nuzzle against or kiss her. (*Id.*) On more than one occasion Hansen attempted to tickle Perun and pulled out the neckline of Perun's shirt in an attempt to look down her shirt. (*Id.*)

Perun states that she did everything she knew to discourage Hansen's behavior of this nature. (*Id.*) On some occasions she would ignore Hansen (*Id.*) and at other times she would walk away (*Id.* at 4.) In January of 2009, Perun stopped working on Saturdays in an effort to avoid contact with Hansen. (*Id.* at 8.) However, in contrast to Lingle and Treadway, Perun admits that at no point in time did she report to any person in a position of authority at PRC or NMG that she was experiencing from sexual harassment by Hansen. (Perun Depo., Doc. 51-17 at 52.)

In the amended complaint, each Plaintiff alleges that Hansen, with the knowledge of PRC, knowingly and intentionally engaged in an ongoing and continuous pattern of conduct that violated the Plaintiffs' rights under Title VII by frequently and repeatedly engaging in sexual harassment of them because of their gender. Lingle and Treadway also allege claims for retaliation in violation of their Title VII rights. In addition to the Title VII claims, the Plaintiffs allege state based claims for assault, battery, and intentional infliction of emotional distress against all Defendants. Further, against PRC and NMG, the Plaintiffs allege claims for relief for negligent hiring, supervision, and retention and negligent infliction of emotional distress under North Carolina law. Finally, Lingle and Treadway allege a claim for relief for wrongful discharge in violation of North Carolina public policy against PRC and Hansen.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil procedure permits the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v Liberty Lobby*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Anderson*, 477 U.S. at 248.

To withstand a motion for summary judgment, the non-moving party must produce competent evidence to reveal the existence of a genuine issue of material fact for trial. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). Courts, in considering motions for summary judgment, view the facts and inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *see, e.g.¸ Gray v Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) ("It is not our job to weigh the evidence . . . or to disregard stories that seem hard to believe. Those tasks are for the jury.")

### III.     DISCUSSION

In their separate motions for summary judgment, many of the Defendants' arguments and factual declarations are repetitive and directed to all three plaintiffs. Some of the arguments are unique to a particular defendant and/or plaintiff. The Court will begin by analyzing PRC's arguments as to the Title VII claims and then proceed to consider PRC and Hansen's arguments regarding the state based claims. Where previous analysis is applicable to the positions of subsequently discussed plaintiffs and defendants, the Court will note this and refer back to such analysis.

#### a.  PRC and Hansen

#### Sexual Discrimination in Violation of Title VII against PRC

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such

individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Since the working environment is one of the "terms, conditions, or privileges" of employment, Title VII provides a cause of action in favor of individuals who are forced to work in a hostile environment. *Hartsell v Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) (citing *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 64-67, 106 S. Ct. 2399, 2403-05, 91 L.ED.2d 49 1986)). "This provision 'not only covers terms and conditions in the narrow contractual sense, but evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.' " *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (quoting *Oncale v Sundowner Offshore Servs.¸Inc.*, 523 U.S. 75, 78, 118 S. Ct 998, 140 L.Ed.2d 201 (1988)). Therefore, a violation of Title VII may occur " 'w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Ocheltree*, 335 F.3d at 331 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 114 S. Ct. 376, 126 L.Ed.2d 295 (1993)).

To prevail on a Title VII hostile work environment claim, a plaintiff must establish that the offending conduct was: 1) unwelcome; 2) based on plaintiff's gender; 3) sufficiently pervasive or severe as to alter the conditions of employment and create a hostile work environment; and 4) imputable to the employer. *Maya v Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001). "If the plaintiff's claim is based on the actions of her supervisor, the employer is subject to vicarious liability [where the harassment culminated in a tangible employment action.] If the plaintiff did not suffer a tangible employment action, the employer has available to it an affirmative defense that may protect it from liability or damages." *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013) (citations omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing,

failing to promote, reassignment with significantly difference responsibilities, or a decision causing a significant change in benefits." *Id.* at 355 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages" by showing (1) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) the employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 356 (citations omitted).

Viewing the facts and allegations in a light most favorable to the Plaintiffs, a reasonable jury could conclude that Lingle, Treadway, and Perun were subjected to unwelcome and offensive conduct, based on their sex, that resulted in a hostile work environment and that the offensive conduct is imputable to PRC. The record is replete with allegations by each Plaintiff of specific instances of sexual harassment and inappropriate verbal and physical conduct by their superior, Hansen, [6] which induced distress, fear, anger, and a dread of reporting to their place of employment. The circumstances surrounding Lingle's interactions with Smith and Lingle's eventual termination allow a reasonable juror to conclude that Lingle suffered a "tangible employment action." In any event, even if Lingle's termination was largely attributable to substandard job performance, a reasonable jury could conclude that PRC failed to exercise reasonable care to prevent and promptly correct the alleged sexual harassment. First, a genuine issue of material fact exists as to whether Hansen's sexual harassment continued after Lingle's initial report to Smith on January 16, 2009. (Lingle Decl., Doc. 49-1 at 14-16.) Such evidence

---

[6] PRC and Hansen's argument, that Plaintiffs and Hansen were "coworkers" (Doc. 38 at 15), is not supported by the factual record. The evidence before this Court clearly shows that major decisions at PRC were, at the very least, always subject to Hansen's approval. (Smith Depo., Doc. 51-10 at 41.)

puts into question whether PRC had in place an anti-harassment policy that was not "defective or dysfunctional," as required for an employer to claim the affirmative defense provided in *Faragher. Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999). Presumably, an effective and functional anti-harassment policy would put an end to sexual harassment once such conduct is brought to the attention of the office manager in charge of HR matters. However, under oath, each Plaintiff alleges that Hansen continued to sexually harass them after this initial disclosure by Lingle. Also relevant to this determination, is Smith's prior knowledge, supported by Lingle's claim that, at the time she first reported Hansen's conduct to Smith, Smith admitted that "[Lingle] was not the first person to tell her about [Hansen's] behavior." (Lingle Decl., Doc. 49-1 at 14.) Second, a genuine issue of material fact exists as to whether the Plaintiffs unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. Assuming the facts and inferences in a light most favorable to the Plaintiffs, both Lingle and Treadway communicated to Smith their experience of and concerns with Hansen's conduct. Additionally, although Perun admits never reporting Hansen's conduct to superiors (Perun Depo., Doc. 51-17 at 52), a genuine issue of material fact exists as to whether any reporting process was available or communicated to employees following NMG's separation from PRC, and assuming the absence of such a process, whether Perun's experience of sexual harassment can be traced to the lack of a reporting process. (Smith Depo., Doc. 51-10 at 76.)[7] [8]

---

[7] Smith admits in her deposition that she was not sure that every employee had a copy of the applicable employee handbook and that she was not even aware of PRC's sexual harassment guidelines.

[8] Contrary to PRC and Hansen's assertion that no further harassment occurred following Smith becoming practice manager in January of 2009 (Doc. 43 at 4), Perun does describe an instance in January where Hansen lifted up her sweater. (Perun Decl., Doc. 49-3 at 8.) In addition, Perun lists February 14, 2009, the date that she remarried her ex-husband Roman Perun, as the date in which Hansen's harassment stopped. (*Id.* at 9.)

Therefore, assuming the facts in a light most favorable to the Plaintiffs, genuine issues of material fact exist as to whether PRC violated the Title VII rights of each of the Plaintiffs.

**Lingle's Claim against PRC for Retaliation in Violation of Title VII[9]**

To establish a prima facie case for retaliation an employee must show that she has engaged in a protected activity that resulted in her employer taking an adverse employment action against her. *King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003) ("[A] causal connection existed between the protected activity and the asserted adverse action.") Once the employee has established a prima facie case, the burden moves to the employer to proffer an alternative, legitimate, and non-retaliatory motive for the adverse employment action. *Id.* If able to do so, the burden shifts again, back to the plaintiff, to show that the employer's proffered justification is just a cover up for retaliation. *Id.*

The parties have presented sufficient facts so that the burden rests with Lingle to present a genuine issue of material fact as to whether PRC's claimed non-retaliatory motive for her termination, failing to keep regular hours at work, was merely a cover up for retaliating against Lingle for filing an EEOC claim. Pursuant to the summary judgment standard for review, Lingle has done so by showing inconsistent responses by management to her work habits and by demonstrating a relationship marked with animosity flowing from Smith to herself.

**Assault and Battery against PRC and Hansen**

Plaintiffs have alleged claims for assault and battery under North Carolina common law based on Hansen's alleged sexual harassment of the Plaintiffs while employed by PRC. A claim

---

[9] In the amended complaint, Treadway had also asserted a retaliation claim but Plaintiffs' consolidated response to the motion argues in support only of Lingle's retaliation claim. Treadway's claim will be dismissed because it is established that Treadway voluntarily left PRC and the facts presented do not give rise to a reasonable inference of retaliation. Presumably, this much was conceded by Plaintiffs in abandoning and failing to argue in support of Treadway's retaliation claim.

of assault is established by a showing of 1) intentional acts and displays of force, 2) which caused the plaintiff reasonable apprehension of offensive contact upon her person. *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981). A plaintiff establishes a claim for battery by showing 1) intentional infliction of offensive contact upon her person, 2) without her consent. *Id.* Where an employee has committed an assault or battery, the employer may be held liable for the employee's behavior if the plaintiff is able to show that the employer specifically authorized the behavior, that the behavior was within the course and scope of employment and in furtherance of the employer's business, or that the employer ratified the behavior after it occurred. *Brown v. Burlington Indus., Inc.*, 93 N.C. App. 431, 436, 378 S.E.2d 232, 235 (1989) (quoting *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 340 S.E.2d 116, *disc. rev. denied,* 317 N.C. 334, 346 S.E.2d 140 (1986)). Ratification may be established by a showing that "the employer had knowledge of all material facts and circumstances to the wrongful act, and that the employer, by words or conduct, shows an intention to ratify the act." *Id.* at 437, 236. Ratification may also be shown by an employer's omission to act to rectify a problem brought to the attention of the employer by an employee. *Id.* ("Where [the employer], through [its manager], had an explicit duty to rectify the problem posed by [its employee's] sexual harassment of plaintiff, [the manager's] omission of action was a course of conduct which a jury could conclude reasonably tends to show ratification of [the employee's] acts by [the employer].") Additionally, although the employer must have knowledge of all material facts related to its employee's acts, ratification may also be found where the employer has been provided with facts "which would lead a person of ordinary prudence to investigate further," yet the employer fails to do so. *Denning-Boyles v. WCES, Inc.*, 123 N.C. App. 409, 415, 473 S.E.2d 38, 42 (1996) (*citing* RESTATEMENT (SECOND) OF AGENCY §91, Comment e, p. 235 (1958)).

Plaintiffs have alleged numerous and specific instances of conduct by Hansen that meet the requirements for the claims of assault and battery. Hansen denies any and all allegations made by the Plaintiffs. Therefore, summary judgment is improper as to Hansen in his individual capacity because genuine issues of material fact exist as to whether the events alleged, as described by Plaintiffs, actually occurred.

Much of the conduct alleged took place during the time period following January 1, 2008, in which PRC exercised independent control of the medical practice. Given Plaintiffs' argument that Hansen was owner and per se a high level employee with significant authority over PRC's actions, his knowledge of his own conduct is imputable to PRC. Hansen was the final source of authority for hiring, firing, and management of PRC's affairs and any tortious conduct by him is also attributable to PRC through a theory of ratification. Therefore, summary judgment is improper as to PRC because genuine issues of material fact exist as to whether the events alleged, as described by Plaintiffs, actually occurred.

### Negligent Hiring/Supervision/Retention against PRC

Plaintiffs allege that PRC was negligent in its supervision and retention of Hansen. To establish a claim for negligent supervision and retention a plaintiff must show that the employer failed to meet "that standard of care that would have been exercised by ordinary, cautious and prudent employers under similar circumstances." *Hogan*, 79 N.C. App. at 495, 340 S.E.2d at 124 (citations omitted). Such a showing is made where the plaintiff proves that an "incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." *Id.* Thus, a plaintiff can prove either the employer's actual notice of the employee's "unfitness or bad habits," or  the employer's constructive notice by showing that the employer could have known the facts if

ordinary care in "oversight and supervision" had been exercised. *Medlin v. Bass*, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990) (citing *Walters v. Lumber Co.,* 163 N.C. 536, 541, 80 S.E. 49, 51 (1913)); *see also Pleasants v. Barnes,* 221 N.C. 173, 19 S.E.2d 627 (1942) (plaintiff must show employer's hiring or retention after actual or constructive knowledge of employee's incompetence).

Assuming the facts in a light most favorable to the Plaintiffs, a genuine issue of material fact exists as to whether PRC knew or had reason to know of Hansen's conduct and subsequently failed to respond in a manner consistent with the appropriate standard of care. Lingle has asserted that she disclosed to Smith her concerns with Hansen's conduct at some point in early to mid-January of 2009. At this meeting Smith expressed prior knowledge of complaints regarding Hansen and his interactions with female employees.[10] (Lingle Depo., Doc. 51-15 at 361.) The remaining questions, whether PRC's investigation, response, and retention of Hansen as an employee were consistent with the proper standard of care, are factual determinations appropriate for jury determination. Additionally, a genuine issue of material fact exists as to whether PRC had constructive notice of Hansen's tortious conduct because a reasonable jury could come to the conclusion that PRC would have discovered the alleged conduct had they exercised ordinary care in their oversight and supervision of employee relations.

**Intentional Infliction of Emotional Distress ("IIED") against PRC and Hansen**

Plaintiffs have alleged claims for IIED against PRC and Hansen. An IIED claim requires 1) extreme and outrageous conduct by the defendant, 2) which is intended to cause and does in fact cause 3) severe emotional distress on behalf of the plaintiff. *Waddle v. Sparks*, 331 N.C. 73,

---

[10] Because a genuine issue of material fact exists as to when Smith had notice, actual or constructive, of Hansen's alleged conduct, it is impossible to say whether each of the Plaintiffs suffered from tortious conduct by Hansen subsequent to Smith's notice.

82, 414 S.E.2d 22, 27 (1992). "Conduct is extreme and outrageous when it is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " Guthrie *v. Conroy*, 152 N.C. App. 15, 22, 567 S.E.2d 403, 408-09 (2002) (quoting *Briggs v. Rosenthal,* 73 N.C.App. 672, 677, 327 S.E.2d 308, 311, *cert. denied,* 314 N.C. 114, 332 S.E.2d 479 (1985)). Severe emotional distress is, "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Johnson v. Ruark Obstretics*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).

Bearing in mind the standard on summary judgment review, Plaintiffs have alleged sufficient facts that could reasonably be regarded as extreme and outrageous. *Hogan*, 79 N.C. App. at 491, 340 S.E.2d at 121 (citations omitted) ("No person should have to be subjected to non-consensual sexual touchings, constant suggestive remarks and on-going sexual harassment . . . without being afforded remedial recourse through our legal system.") The conduct alleged by Plaintiffs and recounted by this Court in the facts section, "if found by a jury to have actually existed, [are] beyond the bounds usually tolerated by a decent society." *Id.*(quotations omitted) (Finding extreme and outrageous conduct where the employee made numerous vulgar and sexually suggestive remarks and initiated physical contact similar to the facts alleged here such as rubbing his privates against plaintiff's buttocks.); *See also Guthrie v. Conroy*, 152 N.C. App. at 23, 567 S.E.2d at 409-10 (Collecting cases that found extreme and outrageous conduct contained in claims of sexual harassment and noting that, "allegations of sexual harassment generally have included one or more of the following: an unfair power relationship . . . ; explicitly obscene or 'X rated' language; sexual advances towards plaintiff; statements

expressing desire to engage in sexual relation with plaintiff, or defendant either touching plaintiff's private areas or touching any part of the plaintiff's body with his private parts.")

Further, each Plaintiff has alleged sufficient facts showing severe emotional distress to survive summary judgment. Lingle alleges anxiety, nervousness, and depression resulting in trouble sleeping and eating. (Lingle Decl., Doc. 49-1 at 20.) Treadway alleges similar severe emotional distress and also recounts symptoms such as headaches and panic induced asthma attacks. (Treadway Decl., Doc. 49-2 at 14.) Perun alleges the same signs of severe emotional distress. (Perun Decl., Doc. 49-3 at 10.) In addition to their own testimony, the Plaintiffs' have provided a "forecast of [] medical documentation" in support of their claims by way of their own examinations and accompanying declarations provided by psychologist Faye Sultan, P.h.D, who determined that each Plaintiff had suffered from severe emotional distress, as defined by North Carolina law, in connection to their employment. (Doc. 51-14); *Sparks*, 331 N.C. at 85, 414 S.E.2d at 28.

Hansen's individual liability for IIED survives summary judgment review and imputation of his conduct to his employer, PRC, is analyzed pursuant to the same framework previously discussed in the Court's review of claims for the intentional torts of assault and battery. For the same reasons Plaintiffs' claims for assault and battery survived as to PRC, *i.e.*, Hansen's absolute control and authority over PRC, Plaintiffs' claims for IIED against PRC also survive.

Ultimately, the decision as to the credibility of Plaintiffs' allegations is one for jury determination, but at the summary judgment stage of analysis each Plaintiff has at least presented a genuine issues of material fact exist as to their claim for IIED.

**Negligent Infliction of Emotional Distress ("NIED") against Hansen and PRC**

A claim for negligent infliction of emotional distress requires the plaintiff to establish that 1) the defendant negligently engaged in conduct, 2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and 3) the conduct did in fact cause the plaintiff severe emotional distress. *Smith-Price v. Charter Behavioral Health Systems,* 595 S.E.2d 778, 782 (N.C.Ct.App.2004) (quoting *Johnson v. Ruark Obstetrics,* 395 S.E.2d 85, 97 (N.C.1990).

Plaintiffs' claims for NIED against Hansen are predicated upon intentional conduct by him and fail for this reason. *Barbier v. Durham County Bd. of Educ.,* 225 F.Supp.2d 617, 631 (M.D.N.C.2002) (dismissing negligent infliction of emotional distress claim against individual defendant where the complaint consisted "solely of allegations of intentional sexual harassment and not negligent acts" by the individual defendant.) (Citing *Mitchell v Lydall, Inc.*, No. 93-1374, 1994 WL 38703 at *3 (4th Cir, Feb. 10, 1994) (unpublished opinion)). Plaintiffs' have conceded as much by failing to argue for a NIED claim against Hansen in their consolidated response to Defendants' motions for summary judgment. (Doc 54 at 43-44.)

Previously, in the analysis of Plaintiffs' claim for negligent retention and supervision, the Court stated that the Plaintiffs had presented a genuine issue of material fact as to whether PRC knew or had reason to know of Hansen's conduct and failed to respond in a manner consistent with the appropriate standard of care. Assuming a jury determination finding such a failure on PRC's behalf, it would be reasonably foreseeable to PRC that such a failure could cause Plaintiffs severe emotional distress and did in fact cause Plaintiffs severe emotional distress. As such, Plaintiffs' claims for NIED against PRC survive summary judgment review.

**Wrongful Discharge against PRC and Hansen**

Lingle alleges wrongful discharge in violation of North Carolina public policy against PRC.[11] "To state a claim for wrongful discharge in violation of public policy, an employee has the burden of pleading that his dismissal occurred for a reason that violates public policy." *Whitt v. Harris Teeter, Inc.*, 165 N.C. App. 32, 37, 598 S.E.2d 151, 155 (2004) *rev'd on other grounds*, 359 N.C. 625, 614 S.E.2d 531 (2005) (citations and quotations omitted). "It is the public policy of [North Carolina] to protect . . . the right . . . of all persons to seek, obtain and hold employment without discrimination or abridgement on account of . . . sex." N.C. Gen. Stat. § 143-422.2 (2003). Therefore, "[a] discharge based on sexual harassment [] offends the public policy of [North Carolina] and may properly support a wrongful discharge claim in violation of public policy." *Whitt*, 165 N.C. App. at 38, 598 S.E.2d at 156; *Guthrie*, 152 N.C.App. at 19–20, 567 S.E.2d at 407; *Russell v. Buchanan,* 129 N.C.App.519, 521, 500 S.E.2d 728, 730; *see also Harrison v. Edison Bros. Apparel Stores, Inc.,* 924 F.2d 530, 534 (4th Cir.1991) (holding that North Carolina's public policy wrongful discharge doctrine was applicable to prohibit sexual harassment); *Phillips v. J.P. Stevens & Co., Inc.,* 827 F.Supp. 349, 352–53 (M.D.N.C.1993) (recognizing wrongful discharge claim in violation of public policy on the basis of sexual harassment).

Here, Lingle has presented sufficient facts to state a claim under Title VII, which is "essentially identical" to the public policy expressed in N.C.G.S. § 143-422.1 et. seq. *Id.* Additionally, as noted in the Court's analysis of Lingle's Title VII claim, a genuine issue of

---

[11] The amended complaint claims wrongful discharge against PRC and Hansen on behalf of Lingle and Treadway. However, Plaintiffs' response to the summary judgment motions only argues wrongful discharge on behalf of Lingle against PRC. Therefore, Treadway's claim for wrongful discharge will be dismissed because there are no facts presented to show that she was terminated as required by N.C. Gen Stat § 143-422.1. Additionally, Lingle's claim against Hansen for wrongful discharge is dismissed because the employer was PRC and not Hansen in his individual capacity.

material fact exists as to whether Lingle was terminated for substandard performance or for her allegations of sexual harassment. As such, a genuine issue of material fact exists for Lingle's claim of wrongful discharge against PRC to survive summary judgment.

**Duty to Mitigate**

PRC argues that any recovery by Lingle is barred because she did not search for employment following her termination from PRC on October 29, 2009, which, if true, would be a failure to mitigate her damages as required by law. However, in her deposition, Lingle presents sufficient facts for the issue of mitigation to be submitted to a jury. (Lingle Depo., Doc. 51-15 at 86-89.)

**Contributory Negligence**

PRC argues that Plaintiffs' negligence claims should be dismissed because Plaintiffs' failure to report their alleged sexual harassment makes them contributorily negligent. *Rorrer v. Cooke*, 313 N.C. 338, 355, 329 S.E.2d 355, 366 (1985) ("In a negligence action, summary judgment is proper where the evidence . . . establishes contributory negligence on the part of plaintiff.") However, as discussed previously, under the facts presented a genuine issue of material fact exists as to whether any of the Plaintiffs' were negligent in waiting to report (Lingle and Treadway) or altogether failing to report (Perun) Hansen's alleged conduct to PRC in light of the contradictory evidence presented as to PRC's sexual harassment policy and reporting mechanism following separation from NMG.

b. **NMG**

Both parties concede that the relevant period of time to evaluate NMG's potential liability is established, on one end, by the date provided by the three-year statute of limitations and, on the other end, the date in which NMG divested itself of ownership of PRC, with

December 31, 2008, being the last day that NMG owned PRC. However, there appears to be conflict as to the exact date from which the three-year statute of limitations dates back. In their memorandum in support of summary judgment, NMG states that the original complaint in this action was filed in state court on May 10, 2011, resulting in a date for NMG's potential liability to begin on May 10, 2008. (Doc. 35 at 1, fn. 1.) In their response, Plaintiffs specifically agree with this argument but do so by stating, "Defendant NMG asserts in its motion that it cannot be held liable for any acts of Hansen before April 20, 2008." (Doc. 54 at 27, fn. 11.) The only explanation for the discrepancy in the date actually stated by NMG, May 10, 2008, and the date attributed to NMG by Plaintiffs in their response, April 20, 2008, comes in a two sentence footnote that argues NMG is mistaken because the "state court action was filed by Rule 3 Application on April 20, 2011." (*Id.* at 54, fn. 13.) No copy of the state court complaint has been provided to the Court. However, in Lingle's Deposition (Doc. 51-15 at 196) the "state court action" is referenced and discussed as an exhibit. The transcript of the deposition includes a recitation of the date that the case was filed consistent with the May 10, 2011, date provided by NMG. In view of this, until Plaintiffs provide proof of the asserted April date, the Court will proceed with May 10, 2011, as the accurate date of filing for the state court complaint resulting in the appropriate time period as to NMG's potential liability dating from May 10, 2008, to December 31, 2008. In any event, the approximately thirty day difference between the two dates has no effect on the positions of either party at this stage of analysis.

**Claims against NMG**

The allegations against NMG and the factual record in support of these allegations are almost identical to those discussed in the previous sections regarding Plaintiffs' claims against PRC. Therefore, where Plaintiffs' claims against PRC survived summary judgment, they also

survive summary judgment as to NMG. Also relevant to this decision is the difference in the alleged response by Goins (NMG) to reports of sexual harassment as compared to Smith's (PRC) response when she received reports. Where Smith initially sympathized with Plaintiffs, expressed support, and initiated an investigation, Lingle alleges that Goins refused to even entertain listening to a description of Hansen's alleged conduct and that Goins stated that she would soon be done with Hansen once NMG separated from PRC. Goins alleged response to Plaintiffs' attempts to report creates a genuine issue of material fact for imputation of liability to NMG for Hansen's alleged intentional conduct in relation to claims for assault, battery, and intentional infliction of emotional distress. As discussed previously, an employee's tortious conduct may be imputed to the employer where the employer fails to investigate reports of misconduct, having previously received information that would prompt a reasonably prudent employer to investigate further, and viewing the facts in a light most favorable to the Plaintiffs, a reasonable jury could conclude this is just what happened here. Therefore, Plaintiffs' claims for intentional torts against NMG survive summary judgment analysis against NMG. Of course, notice to NMG of Hansen's alleged conduct, and whether Goins responded in the manner alleged by Plaintiffs, which she denies, are questions ultimately to be decided by the jury.

### c. North Carolina Workers' Compensation Act

Defendants argue that Plaintiffs' claims against PRC and NMG for NIED and negligent supervision and retention must be dismissed because they fall under the exclusive jurisdiction of the North Carolina Industrial Commission. The North Carolina Workers' Compensation Act (the "Act"), which contains the exclusivity provision in favor of the Industrial Commission, "covers only those injuries which arise out of and in the course of employment." N.C. Gen. Stat. § 97-2(6); *Shaw v. Goodyear Tire & Rubber Co.*, 737 S.E.2d 168, 177 (N.C. Ct. App. 2013) *review*

*denied,* 748 S.E.2d 323 (N.C. 2013); *Hogan*, 79 N.C. App. at 496, 340 S.E.2d at 124. "An injury arises out of the employment when it is a natural and probable consequence or incident of the employment and a natural result of one of its risks, so there is some causal relation between the injury and the performance of some service of the employment." *Shaw*, 737 S.E.2d at 177 (citing *Mintz v. Verizon Wireless*, 735 S.E.2d 217, 220 (N.C. Ct. App. 2012)).

 Here, "the emotional injuries suffered [by the Plaintiffs], resulting from [Hansen's] harassment, [are] not [] a 'natural and probable consequence or incident of employment.' Sexual harassment is not a risk to which an employee is exposed because of the nature of the employment but is a risk to which the employee could be equally exposed outside the employment." *Hogan*, 79 N.C. App. at 496, 340 S.E.2d at 124 (citing *Gallimore v. Marilyn's Shoes,* 292 N.C. 399, 233 S.E.2d 529 (1977)). Defendants' reliance on *Shaw* is unfounded because the decision in that matter turned on the unique and specific allegations contained in the complaint. *Shaw*, 737 S.E.2d at 170-77 ("Plaintiff's supervisor's behavior toward Plaintiff was obnoxious and rude; the harassment was verbal and involved some forms of intimidation but did not involve anything of a sexual nature nor did it involve any physical contact with plaintiff . . . . Here, it is crucial to recall that based upon plaintiffs' allegations, the incident that caused plaintiffs' emotional distress was not the harassment by her supervisor, but the defendant's mishandling of her complaints regarding that harassment."); *Wilson v. Gaston Cnty.*, 3:13-CV-58-GCM, 2013 WL 1891276 (W.D.N.C. May 6, 2013) ("Further, the *Shaw* Court went out of its way to point out that its case was unique in that the NIED claim at issue was defendant employer's mishandling of plaintiff's sexual harassment complaint and not the actual harassment itself.").

As such, Plaintiffs' negligence claims for emotional injury resulting from alleged sexual harassment by Hansen are not barred by the exclusivity provision of the Act.

### d. Perun Bankruptcy

Defendants claim that Perun's failure to provide information regarding this matter on her bankruptcy application requires dismissal of her claims pursuant to the doctrine of judicial estoppel. "Judicial estoppel is an equitable doctrine that exists to prevent litigants from playing 'fast and loose' with the courts." *Folio v. City of Clarksburg*, 134 F.3d 1211, 1217-18 (4th Cir. 1998). However, "the party to be estopped must have acted intentionally, not inadvertently." *Id.*

Here, Perun filed for Chapter 7 bankruptcy on August 13, 2010, and was discharged in bankruptcy on November 19, 2010. (Doc. 54 at 47.) Perun's EEOC charge was filed in July of 2009, and the EEOC mailed a Dismissal and Notice of Rights with respect to NMG on December 21, 2009, and with respect to PRC, on or about August 15, 2011. (Doc. 35 at 20.) Perun made no mention of these pending matters where the bankruptcy application asked for all suits and administrative proceedings to which she is or was a party within one year immediately preceding the filing of her bankruptcy case. (Doc. 25 at 21.) Now that this omission has come to light, Allen Wood, Perun's counsel in the bankruptcy filing, has communicated to the bankruptcy trustee the relevant facts and is awaiting a response. (Doc. 49-5.)

The Court declines at this stage to reject Perun's explanation that her omission was simply the result of a mistake by a layperson, and that she was not aware that an EEOC investigation and corresponding Notice of Rights qualified as an administrative proceeding. (Doc. 54 at 48.) Such an oversight would not necessarily support an inference of a party playing "fast and loose" with the courts. Additionally, judicial estoppel is a remedy based in equity and

the fact that the bankruptcy trustee is aware of the issue may serve to alleviate concerns as to inequitable results.

## IV.   CONCLUSION

Based upon the foregoing, **IT IS HEREBY ORDERED**, that Defendants' Motions for Summary Judgment are **GRANTED** in Part and **DENIED** in Part. Defendants' Motions are **GRANTED** in part in that Treadway's Title VII Retaliation and Wrongful Discharge claims against PRC are **DISMISSED** and Lingle and Treadway's Wrongful Discharge Claims against Hansen are **DISMISSED**.

Signed: December 19, 2013

Richard L. Voorhees
United States District Judge